**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN MOSES, | |
| Plaintiff, | |
| v. | Civil Action No. 20-5278 (RK) (JTQ) |
| WAYFAIR LLC., et al., | **OPINION** |
| Defendants. | |

**KIRSCH, District Judge**

 **THIS MATTER** is before the Court by way of Wayfair LLC's ("Wayfair"), Dan Hudson's, Max Uniman's, Shellie Weber's, Linda Herzstein's, Tom Mitchell's,[1] Luis Rodriguez's, Gerrod Smith's, and Donald Lovill's (collectively, "Defendants"[2]) Motion for Summary Judgment. (ECF No. 91 ("Def. Mot").) *Pro se* Plaintiff John Moses opposes this Motion. (ECF No. 99 ("Pl. Opp.").) This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

**I.** **THE DISCOVERY DISPUTE**

 Prior to reciting the factual background of this case, the Court discusses a purported discovery dispute. Plaintiff, in response to many of Defendants' Statements of Undisputed Material Facts (ECF No. 91-2 ("Def. SUMF")), objects to the admissibility of the documents

---

[1] Linda Herzstein and Tom Mitchell's full names—while not originally pled by Plaintiff—have been ascertained through Defendants' responsive pleadings and discovery. (*See* FAC at 1; Def. Mot. at 8 nn. 1–2.)

[2] Named Defendant Christopher Keats is not represented by Counsel representing Defendants on this present motion. Therefore, all references to Defendants refer only to the Defendants referenced above. (Def. Mot. at 1 n.3.)

underlying these material facts. Specifically, Plaintiff objects to the Declarations of multiple individuals in this case, including Defendant Shellie Weber, Cara Hart,[3] Defendant Donald Lovill, Defendant Dan Hudson, and Defendant Linda Herzstein. For example, Plaintiff writes:

> The Weber [Declaration] . . . is because [J]udge Arpert closed discovery on January 31st, 2024 at 10:51 am, at the request of attorney Mr. Szyba. (Pl. Opp. Ex. 2, 0.1. 89, Status Conference, Transcript Page 8 Lines 12-15 & Page 9 Lines 3-5). The Weber [Declaration] that Mr. Szyba has attached to support his Summary Judgement Motion [sic] gives defendants an unfair advantage over Plaintiff.

(ECF No. 99-1 "(Pl. SUMF Resp.") ¶ 1.) Plaintiff argues against the admissibility of these Declarations because he claims that, in effect, that he has been prejudiced by not having deposed the subjects of these Declarations. (*See, e.g.*, Pl. SUMF Resp. ¶¶ 1, 4, 8, 9, 11, 48, 51.) For the reasons set forth hereinafter, Plaintiff's claim of unfairness has no merit.

The Honorable Douglas E. Arpert, U.S.M.J. (ret.) already addressed some of Plaintiff's claimed discovery issues in his December 21, 2022 Order. (*See* ECF No. 47 ("December 21, 2022 Order").) There, in denying Plaintiff's request for a fact discovery deadline extension so that Plaintiff could serve additional written discovery requests, the December 21, 2022 Order noted that the Court had "already granted Plaintiff two fact discovery extensions and Plaintiff . . . had over six months to serve written discovery requests." (*Id.* at 3.) While Plaintiff appealed the December 21, 2022 Order, the undersigned affirmed it. (*See* ECF Nos. 60, 61.) Because the December 21, 2022 Order gave Plaintiff explicit directions—with which the undersigned agreed (*see* ECF No. 60 at 5–6)—that Plaintiff would have "the opportunity to elicit the information he

---

[3] Cara Hart was the Safety Supervisor who oversaw the three warehouse buildings located at Wayfair's facility in Cranbury, including the Cran 1 Warehouse. (Weber Decl. ¶ 12.) She is not a defendant in this litigation.

seeks from Defendants during depositions[,]"  (December 21, 2022 Order at 3)—and because discovery in this matter was open for around two years, (*see* ECF Nos. 34, 88), the Court finds that there is no basis for any claim of prejudice or unfairness to Plaintiff.[4]

## II.   BACKGROUND

### A.  THE PARTIES

Underlying the present motion are several different employment claims involving Plaintiff which arise from his short tenure of employment with Wayfair. Plaintiff identifies as African American, and he is a resident of the State of New Jersey. (Def. SUMF ¶ 6; Pl. Opp. at 1.) Plaintiff appears to claim that he lacks vision in his left eye, a condition for which he needs to wear dark-tinted glasses. (*See* FAC ¶ 19.) Later in this litigation, it seemed that Plaintiff categorized his alleged disability as one where—because of his lack of vision—his eyes are sensitive. Specifically, Plaintiff testified that his eyes "don't adapt to light."  (Pl. Dep. at 80:01–09.) Plaintiff has also stated that he wears dark-tinted glasses to prevent headaches from changes in lighting. (*Id.* at 83:22–84:07.) Plaintiff has also stated that he wears dark-tinted glasses to protect "his eye from getting bumped." (*Id.* at 83:22–84:07.)

Wayfair is an online seller of furniture and home goods with fulfillment and distribution centers throughout the United States including facilities located in Cranbury, New Jersey. (Def. SUMF ¶ 1.)[5] This action also involves a number of Wayfair's employees. Defendant Donald Lovill ("Lovill") was Plaintiff's Supervisor when Plaintiff started working for Wayfair for about a month,

---

[4]  The Court separately notes that it too has been permissive with Plaintiff in extending filing deadlines in light of his *pro se* status—including with respect to the very Motion before the Court. (*See* ECF Nos. 98, 102.)

[5] Plaintiff raises a Rule 56.1 objection to this fact in part on the basis that the Declaration upon which this undisputed fact is based unfairly prejudices him. As noted at *supra* Section I, this objection is without basis. The Court deems this fact undisputed.

from September 23, 2019 until October 28, 2019. (ECF No. 91-10 ("Weber Decl.") ¶ 8.) Defendant

Tom Mitchell ("Mitchell") was Plaintiff's Supervisor from October 29, 2019 until December 2,

2019. (Weber Decl. ¶ 9.) Defendant Christopher Keats ("Keats") was Plaintiff's Supervisor from

December 3, 2019 until Plaintiff's termination, (Weber Decl. ¶ 10), on April 8, 2020. (*Id.* ¶ 41.)

      Defendant Dan Hudson ("Hudson") worked at Wayfair from 2016 until 2023 and was

acquainted with Plaintiff as one of the bulk drivers working in the "Cran. 1" warehouse building

in Cranbury, New Jersey between 2019 and 2020. (ECF No. 91-27 ("Hudson Decl.") ¶ 3.) During

Plaintiff's employment at Wayfair, Hudson was "Director of Operations" and did not supervise

Plaintiff who was "five reporting levels below" Hudson. (Hudson Decl. ¶ 4.) Defendant Luis

Rodriguez ("Rodriguez") was a Receiving Supervisor while Plaintiff was employed at Wayfair.

(Weber Decl. ¶ 11.) Defendant Gerrod Smith ("Smith") was an Operations Manager who worked

Sunday through Wednesday during Plaintiff's tenure while at Wayfair. (ECF No. 91-5 ("Smith

Dep.") at 11:3–13.)

      Defendant Max Uniman ("Uniman") worked at Wayfair in 2019 as a Talent Acquisition

Recruiter. (ECF No. 91-6 ("Uniman Dep.") at 7:25–8:09.) Uniman's duties included "trying to

find candidates for open positions in the warehouse." (Uniman Dep. at 8:03–8:15.) Defendant

Shellie Weber ("Weber") held the position of Talent Manager at Wayfair during the time at which

Plaintiff was employed by Wayfair. (Weber Decl. ¶ 4.) Weber's responsibilities included the

oversight of three warehouse buildings at Wayfair's facility in Cranbury, New Jersey. (*Id.*)

Defendant Linda Herzstein ("Herzstein") is Senior Talent Management Associate who has worked

at Wayfair since 2017. (Weber Decl. ¶ 7.) Herzstein held the position of Talent Manager at Wayfair

during the time at which Plaintiff was employed by Wayfair. (Weber Decl. ¶ 7.)

### B. PLAINTIFF'S EMPLOYMENT WITH WAYFAIR

Plaintiff commenced employment with Wayfair on September 23, 2019 as a Bulk Department Warehouse Associate. (Def. SUMF ¶ 2.) Plaintiff worked as an order picker, where he was responsible for picking and scanning orders using an "RF gun." At times, Plaintiff was assigned to drive a Raymond Order Picker Forklift. (Def. SUMF ¶ 5.) The precise warehouse at the Cranbury Wayfair Location where Plaintiff worked while employed at Wayfair is in dispute. (*E.g.*, 99-1 ("Pl. SUMF Resp.") ¶¶ 8, 11, 17–18.) Prior to his employment with Wayfair, Plaintiff was employed by Home Depot and Amazon. (Def. SUMF ¶ 7.)

On the same day that he commenced his employment with Wayfair, Plaintiff attended New Hire Orientation. (Def. SUMF ¶ 26.) At New Hire Orientation, a member of Wayfair's Talent Management team provided Plaintiff and the other new hires with information about Wayfair's policies and procedures. (Weber Decl. ¶ 16.) Curiously, the record does not contain any information as to what paperwork needs to be submitted under Wayfair's Policies to obtain an accommodation under the Americans with Disabilities Act ("ADA") (citations omitted). Instead, Wayfair has reproduced its "Equal Employment Opportunity Policy" and a general description of what this policy means. (Weber ¶¶ 13–14; ECF No. 91-11 ("Ex. 1 to Weber's Decl.").) At his deposition, Plaintiff stated that he reported his request for accommodations verbally to his manager, Donald Lovill, several days after Plaintiff's hiring. (ECF No. 91-4 ("Pl. Dep.") at 77:14–15.) Specifically, Plaintiff testified: "I asked [Lovill] at one point . . . if I could wear my shades out on the floor because I wear – sometimes I wear the certain shades to protect my eyes because one of my eyes are bad." (Pl. Dep. at 77:05–08.)

Plaintiff contends that in his previous employment at Home Depot and Amazon, he completed paperwork to request an accommodation. (*Id.* ¶ 31.) There is no evidence in the record

that Plaintiff ever informed Defendants of these previous requests for accommodation at his other employers.[6] Moreover, Plaintiff seems to acknowledge that he was able to accomplish his work without the "shades," but that he suffers from headaches afterwards.[7] (Pl. Dep. at 86:09–14.)

On October 17, 2019, an accident occurred when Plaintiff was operating a cherry picker forklift at the Wayfair facility in Cranbury, New Jersey. (Def. Mot. ¶ 41.) According to Defendants, the cherry picker forklift that Plaintiff was driving "hit a support beam . . . ." (Def. Mot. ¶ 42.) While Plaintiff disputes the cause of the collision, he does not appear to dispute that the cherry picker forklift he was driving hit a support beam. (*See* Pl. SUMF Resp. ¶ 42.) There is a question of fact as to whether any property damage resulted from this collision. (*See* Pl. SUMF Resp. ¶¶ 44–45.) It is undisputed that Plaintiff was advised to go to the hospital because he had "blood running down." (Def. SUMF ¶ 45.) On that same day, Plaintiff was temporarily removed from his duties as forklift driver in accordance with Wayfair's Near Miss Policy as it related to property damage related incidents; Plaintiff was drug tested and re-trained prior to being permitted to drive the cherry picker forklift again. (*Id.* ¶¶ 43–46.) There is a question of fact regarding how long this reassignment was for, although it is undisputed that the reassignment was temporary. (*See* Def. SUMF ¶ 46; Weber Decl. ¶ 43.) According to Weber's Declaration, this temporary reassignment

---

[6] The extent of information before the Court on this issue is as follows:

> **Q.** Did you ever fill out any paperwork or a form request for accommodation to wear your shades at work?
> **A.** Where?
> **Q.** At any of those jobs.
> **A.** Yes, I – I actually, yeah, I did.
> **Q.** Where?
> **A.** Home Depot. At Home Depot and at Wayfair, yeah – not Wayfair, at – I meant to say Amazon.

(Pl. Dep. at 84:18–84:02.)

[7] At his deposition, Plaintiff stated the following when asked if he was able to complete his work without his "shades." He said: "I'm going to say unable to? I would have headaches later on. So I still had to do my job." (Pl. Dep. at 86:12–14.)

was described as follows. Plaintiff was "re-trained in the Receiving [D]epartment, without any change to rate of pay or shift assignment and was paid for all time worked." (Weber Decl. ¶ 23.) Further, she states that "[a]fter his successful completion of this training, Plaintiff resumed working and operating his cherry picker in the area where he normally worked." (*Id.*) Thus, it is undisputed that (1) Plaintiff did not incur any changes in his pay or shift assignments because of this temporary reassignment and (2) that Plaintiff was paid for all time worked. (Pl. SUMF Resp. ¶ 46.)

A day later on October 18, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"); he later amended the Charge on December 31, 2019. (Def. SUMF ¶ 75; *see generally* ECF No. 91-9 ("EEOC Charge").) In the October 18, 2019 Charge of Discrimination, Plaintiff laid out the following six details under the "particulars" of the event:

1. Rodriguez referred to me over the walkie talkie as the "Black Associate."
2. Rodriguez said to me "I am the head n***** in charge."
3. Rodriguez asked me "Are you the sick guy?"
4. Rodriguez said to me "I don't care if your black a** was injured the night before, I'm still gonna work your black a**."
5. While I was working, Rodriguez said to me "N***** do you know when breaktime is?
6. While I was working, Rodriguez said to me "Clock out n*****, I don't need your sick black a**. I already told my boss I don't need you."
   I allege Mr. Rodriguez's treatment denies me a workplace free of harassment and had me clock out because he believes I am sick and disabled.

(EEOC Charge at 2–3.) In addition to Plaintiff's allegations of discrimination on the basis of race and disability, Plaintiff noted that he was leveling allegations of discrimination based on retaliation. (*Id.* at 3–4.) In his Amended Charge of Discrimination filed on December 31, 2019,

Plaintiff updated the "particulars" of the event to note that he was denied a bonus for an employment referral of Adam Robinson ("Robinson"), which he believed was a form of "retaliation." (*Id.* at 4.) The December 31, 2019 Charge of Discrimination states the following: "Although I filed an EEOC charge alleging discrimination, [Wayfair] continue[d] to discriminate against me. I referred Adam Robertson [sic] for work to [Wayfair] and Mr. Robertson [sic] was hired . . . . Since Mr. Robertson [sic] was hired, I believe the denial of my referral bonus is another form of retaliation." (*Id.*)

The specifics underlying this last claim—that is, Plaintiff's alleged referral of Robinson and Robinson's subsequent hiring—are muddled. According to notes from Wayfair's recruiting platform, Greenhouse Recruiting, Robinson was "added" to Wayfair's Greenhouse Recruiting system on September 16, 2019 at 3:47 p.m. and moved into "Interview" status by Uniman at 3:57 p.m. on September 16, 2019. (ECF No. 91-8 ("Ex. 5 to Syzba's Decl.") at 2.) According to these notes, Robinson was interviewed on September 18, 2019 and was moved into "Offer" status for Bulk Driver on September 24, 2019. (*Id.*) The Greenhouse Recruiting notes do not reflect any referrals. (*See id.*) It is undisputed that Plaintiff himself commenced his employment on September 23, 2019. (*See* Def. SUMF ¶ 2.)

For his part, Plaintiff claims he referred Robinson, whose name Plaintiff repeatedly appears to have misspelled. (*See* EEOC Charge at 4.) Specifically, Plaintiff claims that Plaintiff, Uniman, and Robinson had a three-way telephone call on September 16, 2019—a full week before Plaintiff started working at Wayfair—at which point Plaintiff claims he referred Robinson for work at Wayfair. (ECF No. 99-3 at 31; *see also* Uniman Dep. at 87:01–87:25.) Plaintiff provides a telephone log which reflects a ten-minute conference call with an unidentified phone number in Cranbury, New Jersey on September 16, 2019 commencing at 3:42 p.m.—around that same time

that an entry regarding Robinson was made in the Greenhouse Recruiting system. (ECF No. 99-3 at 31.) Plaintiff also appends a text message conversation with an unidentified number—who Plaintiff claims is used by Robinson—that appears to indicate that Robinson was to start his employment at Wayfair on September 26, 2019. (*See* ECF No. 99-3 at 33–36.)

On November 14, 2019, Recruiter Veronica Alvarez ("Alvarez") advised Weber that earlier that day, she had encountered Plaintiff at the Talent Acquisition office where Plaintiff asked Alvarez when Plaintiff was going to get paid for referring Robinson for work at Wayfair. (Weber Decl. ¶ 20.) Alvarez advised Weber that she checked Robinson's application, saw notes on the application that Uniman had found Robinson on Indeed.com—an employment hiring platform— and advised Plaintiff of this fact. (*Id.*) Alvarez advised Weber that Plaintiff became upset and started raising his voice saying Wayfair was "giving him the runaround." (*Id.*) At Weber's direction, Alvarez wrote a statement memorializing her interaction with Plaintiff. (*Id.*; *see also* ECF No. 91-13 ("Alvarez Statement").)

On November 15, 2019, Plaintiff and Weber had a follow-up conversation, the contents of which are disputed. According to Defendants, Weber explained to Plaintiff that, after consulting with the Talent Management team, it was determined that Plaintiff was not eligible for the referral bonus both because Robinson "started in the Wayfair system" on September 16, 2019 prior to Plaintiff's start date of September 23, 2019 and because Robinson's referral was not made through the appropriate methods. (Def. SUMF ¶ 40.) According to Plaintiff, the conversation did not proceed as Defendants claim. (Pl. SUMF Resp. ¶ 40.) Further, according to Plaintiff, Robinson attended orientation on September 26, 2019—three days after Plaintiff had commenced his employment with Wayfair and because of this, he is entitled to his referral bonus. (*Id.*)

Approximately six months later on April 3, 2020, Plaintiff clocked into work at 4:22 p.m.

(*See* ECF No. 91-24 ("Ex. 14 to Weber's Decl.").) According to Defendants, after the start of Plaintiff's shift, the following events occurred. At approximately 5:10 p.m., Weber—while in her office—heard a male voice outside her office having a one-sided conversation; Weber understood the person outside her office to be on a phone call. (Def. SUMF ¶ 54.) In response to hearing this supposed phone call, Weber requested that the video footage of the warehouse floor be pulled from the area she heard the voice and for the timeframe in question, which was between 5:00 and 5:30 p.m. (Def. SUMF ¶¶ 57–58.) According to Defendants, upon review of the footage, Weber determined that Plaintiff had violated the Electronic Device Usage Policy because Plaintiff was speaking on his phone via a Bluetooth headset in contravention of the Electronic Device Use Policy which mandates that no cell phone be used on the work floor. (Def. SUMF Resp. ¶¶ 59, 63; *see also* ECF No. 91-16 ("Executed Electronic Device Usage Policy") at 2.) Plaintiff appears to dispute that he was on the phone during this time. (Pl. SUMF Resp. ¶¶ 54–57.) According to Defendants, the video footage also showed "Plaintiff leave the building while on the clock, go to his car, and return." (Def. SUMF ¶ 41.) After consulting with Plaintiff's supervisors to see if Plaintiff had permission to leave the building, Weber also determined that Plaintiff should be terminated for "theft of time for leaving the building while on the clock not during break time and sitting on his cherry picker, as well as boxes of product, for a period of time from 5:04 p.m. to 5:23 p.m." (*Id.* ¶ 63; Weber Decl. ¶¶ 32–33.) Plaintiff counters that Weber never actually reviewed the footage, or alternately, that she reviewed the footage for a different reason. (Pl. SUMF Resp. ¶¶ 54–57, 63.)

In addition to these facts, Plaintiff states that there was an IT issue occurring during this same time period that he is seen on security footage sitting in the warehouse; it is this alleged IT issue that supposedly kept Plaintiff from working. (*See* Pl. SUMF Resp. ¶¶ 63–64.) While

Defendants claim that their review of their IT records for the April 3, 2020 shift reveals no equipment issue at that time which would have prevented Plaintiff from working or would explain why he was sitting and walking out to his car while on the clock, (Def. SUMF ¶ 66; Weber Decl. ¶ 34), a system log from that day details an IT issue regarding an "RF gun" did occur on April 3, 2020 and was called in at 7:59 a.m. (ECF No. 91-22 ("Incident Report") at 2; *see also* Def. SUMF ¶ 67.) According to the notes on the system log, this issue was resolved five hours and forty-three minutes later, well before the relevant time of the incident at issue here. (Incident Report at 2.) The notes from the system log state the following regarding the impact of the problem: "My entire department unable to work." (*Id.* at 2.)

Less than a week later on April 8, 2020, Weber—with Hudson as a witness—told Plaintiff that his employment was terminated for "violation of company policy." (Weber Decl. ¶ 41.) Plaintiff filed his Complaint in this lawsuit three weeks later on April 29, 2020. (*See* ECF No. 1.)

### C. WAYFAIR'S EMPLOYMENT POLICIES

There are several internal Wayfair policies relevant to the present motion. These are the following.

#### 1. REASONABLE ACCOMMODATIONS

According to the Wayfair Employee Guide:

> Wayfair is an equal opportunity employer. This means that to the fullest extent required by law, employment decisions are based on merit and business needs, and not on race, color, citizenship status, national origin, ancestry, sex, sexual orientation, age, religion, pregnancy, creed, physical or mental disability, medical condition, marital status, protected veteran or military status, gender identity, gender expression, transgender identity, genetic information or any other basis protected by applicable law.

> This policy applies to all areas of employment, including recruitment, hiring, training, promotion, compensation, benefits and

all other privileges, terms, and conditions of employment.

(Ex. 1 to Weber's Decl. at 2.) The Wayfair Employee Guide also states that Wayfair:

> makes reasonable accommodations for qualified applicants and employees with disabilities unless doing so creates an undue hardship, in accordance with all legal requirements. Any applicant or employee with a disability who requires an accommodation to perform the essential functions of the job should contact a Talent Management Representative to request an accommodation. Wayfair will work with the individual to attempt to identify a reasonable accommodation that will not impose an undue hardship on Wayfair.

(*Id.*)

### 2. EMPLOYEE REFERRAL PROCESS

Wayfair has policies for employee referrals for hiring. Under Wayfair's Employee Referral Program, Wayfair details how an employee who refers a candidate through the designated methods can earn a referral bonus if that candidate is hired by Wayfair. (Def. SUMF ¶ 20; *see generally* ECF No. 91-12 ("Ex. 2 to Weber's Decl.").) The Employee Referral Program brochure contains the following language: "Full-time and part-time employees of Wayfair are eligible to participate in the program." (Ex. 2 to Weber's Decl. at 2.) It states further that ineligible candidates for the bonus include "former Wayfair employees, temporary agency personnel, candidates responding to a college job posting ad placed by a current Wayfair employee, and employee referral candidates that have already been submitted by employment agencies that result in an agency fee hire." (*Id.*) Whether a phone call is or can be considered a referral under the referral program is disputed by the parties. The Employee Referral Program brochure does contain detailed instructions as to how to submit referrals via Greenhouse Recruiting. (*See* Ex. 2 to Weber's Decl. at 3.)

### 3. EQUIPMENT OPERATION AND WAREHOUSE SAFETY

Wayfair has an Equipment Near Miss Incident Policy ("Near Miss Policy") where Wayfair defines the appropriate disciplinary and training processes for employees who fail to meet

Wayfair's standards and expectations pertaining to the safe operation of equipment. (Def. SUMF ¶ 21; *see* ECF No. 91-15 ("Near Miss Policy").) While it appears that Defendants invoked the "Property Damage Accident" provision of the Near Miss Policy, it is disputed whether property damage resulted from Plaintiff's October 17, 2019 incident. Under the Property Damage Accident provision of the Near Miss Policy, where the incident is an employee's first accident, the employee must complete a post-accident drug screen, the employee is issued a warning, and "the employee [is] prohibited from operating <u>any</u> equipment for 1 week. During this time-period, the employee will be placed in another workgroup for the duration of his/her shift, as determined on a daily basis by management." (*Id.* at 2) (emphasis in the original).

Wayfair also has an Electronic Device Usage Policy which prohibits "all employees" from the "[u]se of cell phones, including text messaging while working/on an equipment [sic] or on the warehouse floor." (Executed Electronic Device Usage Policy at 2.) Plaintiff acknowledged receipt of this Electronic Device Usage Policy. (*Id.*)

Wayfair also has a policy of color-coded vests for identification purposes in its warehouses. Specifically, the color-coded vests allow Wayfair to identify who is authorized to be on the warehouse premises. (Hudson Decl. ¶ 6.) New Associates were required to wear green or yellow vests, authorized visitors to the warehouse were given pink vests to wear for their duration of time on the warehouse premises, and "Team Leads," Supervisors, and Managers wore vests of other designated colors. (*Id.* ¶ 5.) Non-employees did not wear vests. (*Id.* ¶ 7.)

### D. PROCEDURAL HISTORY

Plaintiff filed his eight-count, FAC on November 26, 2020. (*See* FAC.) Interpreting Plaintiff's pleadings liberally in light of Plaintiff's *pro se* status, the Honorable Michael A. Shipp, U.S.D.J. construed the FAC to put forth claims for race-based and disability-based discrimination

under theories of disparate impact, hostile work environment, and retaliation. (*See* ECF No. 27 at 5.) The Court interpreted Plaintiff to be pleading four separate causes of action, including § 1983 claims (Counts I, II, IV), the ADA (Count III), the New Jersey Law Against Discrimination ("NJLAD") claims (Counts V, VI, VII, VIII) as well as causes of action arising under Title VII. (*See generally* FAC at Counts V, VII, VIII.) On December 30, 2021, Judge Shipp dismissed the § 1983 claims (Counts I, II and IV) without prejudice. (ECF Nos. 27, 28.) Judge Shipp also dismissed Count III and all Title VII claims as to all Defendants aside from Wayfair who were also dismissed without prejudice. (*Id.*) The case was reassigned to the undersigned on May 15, 2023. (*See* ECF No. 53.) At no time thereafter has Plaintiff moved to amend his complaint again. Thus, the FAC remains the operative pleading.

Defendants filed the present motion for summary judgment on March 1, 2024. (*See* Def. Mot.) After receiving numerous extensions, Plaintiff filed his opposition on May 20, 2024 to which he appended a multitude of exhibits, often without any context. (*See* Pl. Opp.) Defendants replied on June 12, 2024. (*See* ECF No. 103 "Def. Rep."). Thus, before the Court is Defendants' Motion for Summary Judgment in which they seek dismissal of all remaining claims.

## III.   **LEGAL STANDARD**

A motion for summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248).

"The Court must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party." *Razak*, 951 F.3d at 144 (citing *Anderson*, 477 U.S. at 255); *see also Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008). Summary judgment "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). While a "judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial[,]" *Anderson*, 477 U.S. at 249, a non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.    DISCUSSION

As noted above, Judge Shipp dismissed Counts I, II and IV. (ECF Nos. 27, 28.) Count III as to all Defendants aside from Wayfair—as well as all Title VII claims as to all Defendants aside from Wayfair—were also dismissed. (*Id.*) While difficult to decipher, the following Counts remain: Count III under the ADA against Wayfair only; Counts V, VI, VII, and VIII under the NJLAD against all Defendants; and Title VII claims under Counts V, VII, and VIII against Wayfair only.

### A.    COUNTS III, VI – AMERICANS WITH DISABILITY ACT ("ADA") "RETALIATION" AND NJLAD "RETALIATION" CLAIMS

Plaintiff advances an ADA claim against Wayfair in Count III. In effect, Plaintiff argues that Wayfair violated the ADA both by failing to allow Plaintiff to wear dark-tinted glasses that

he wears because of his disability and by failing to train Plaintiff on the Reach Truck forklift even though he was qualified for same. No genuine issues of material fact as to this Count exists; summary judgment on Count III is thus appropriate.

The Court first addresses the question of precisely what type of ADA claim Plaintiff is advancing. Defendants argue that—as noted in the description of the relevant count in the FAC (*see* FAC ¶ 101)—Plaintiff pleads a retaliation claim under the ADA rather than a discrimination claim under same. (Def. Mot. 37–39.) Plaintiff does not address this claim in his opposition.[8] (*See* Pl. Opp.) Upon review of Plaintiff's FAC—and liberally construing his pleadings as is required of the Court—the Court disagrees with Defendants. The Court finds that Count III is simply mistitled: the substance of Plaintiff's FAC makes clear that Plaintiff pleads an ADA discrimination claim. More specifically, Plaintiff pleads that he was fully qualified to drive a forklift, that he lacked vision in his left eye, and that he requested "to be allowed to wear his dark prescription glasses on Wayfair's work floor." (FAC ¶¶ 105–07.) According to Plaintiff, Defendants allowed other forklift drivers to wear dark-tinted glasses but denied Plaintiff such accommodations. (*Id.* ¶ 109.) Thus, because Plaintiff argues that Wayfair treated disabled employees worse than non-disabled employees, Plaintiff advances an ADA discrimination claim under a disparate treatment theory.[9]

---

[8] While the Court could consider this claim abandoned at the outset given Plaintiff's failure to provide the Court with any facts, evidence in the record, or opposition to Defendants' motion on this point, the Court will review Plaintiff's claims for clarity of the record. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion."); *see Thomas v. Keough*, No. 22-05758, 2024 WL 414041, at *15 (D.N.J. Feb. 5, 2024) (finding claims abandoned where plaintiff had "failed to substantively respond to Defendants' arguments" (citing *McCarthy v. Int'l Ass'n of Machinists & Aero. Workers*, 2021 WL 5766569, at *2 n.3 (3d Cir. Dec. 6, 2021)); *Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 511–12 (E.D. Pa. 2018) (considering claim abandoned where plaintiffs did not respond to arguments within defendants' opposition brief).

[9] Judge Shipp interpreted Plaintiff's FAC in the same manner at the motion to dismiss stage, stating that— "although unclear"—he believed Plaintiff to be pleading a disparate treatment theory of disability

Thus, the Court turns to the elements of disparate treatment claim under the ADA, which are as follows:

> "(1) [Plaintiff] is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."

*Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000) (internal citations omitted). The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to ADA disparate treatment claims. *Id.*

In the first prong, the Court must determine whether Plaintiff's purported disability constitutes a qualifying disability within the meaning of the ADA. Although Plaintiff has provided different reasons as to why he needs to wear dark-tinted glasses, construing the pleadings liberally as is required of the Court, the Court interprets Plaintiff's FAC to be alleging that he suffers from some form of monocular vision. Plaintiff testified that he lacks vision in his left eye, and consequently, suffers from headaches and light sensitivity for which he needs to wear dark-tinted glasses. (*See* Pl. Dep. at 80:06–08; 80:1–9; 83:22–84:07; 83:22–84:07.[10]) However, aside from his own deposition testimony, Plaintiff has offered no additional evidence, including any medical corroboration, in support of his claimed disability. Moreover, Plaintiff failed to adduce any evidence that he provided Wayfair with any proof of a disability aside from his claim that he orally advised Wayfair personnel that he had some unspecified, undiagnosed visual limitation affecting

---

discrimination "whereby Wayfair treated disabled employees worse off than non-disabled employees." (ECF No. 27 at 7.)

[10] While Plaintiff has also testified that he wears dark-tinted glasses to protect "his eye from getting bumped[,]" (Pl. Dep. at 83:22–84:07), the Court does not read this statement to be incongruent with Plaintiff's general claim that he lacks vision in his left eye.

one eye.

Under the ADA, a disability is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). Here, Plaintiff has provided no evidence as to his condition or consequent limitations; the only record evidence is Plaintiff's own testimony that he suffers from visual impairments.[11] This is insufficient to meet the burden of proof. *See Walker v. U.S. Sec'y of the Air Force,* 7 F. Supp. 3d 438, 452 (D.N.J. 2014) (granting summary judgment on, *inter alia*, a disparate treatment ADA claim, and noting that the "ADA's disability definition must 'be interpreted strictly to create a demanding standard for qualifying as disabled . . . .'" (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002))); *see also Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) ("self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

What is more, even if Plaintiff had submitted some modicum of medical proof on this issue, he has failed to show that this disability substantially limited major life activities as required under the ADA. *See Walker*, 7 F. Supp 3d at 452 (explaining the substantial limitation requirement of the ADA and noting that "'Merely having an impairment does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity.'" (internal quotations omitted)).

Plaintiff appears to allege that his purported visual impairment substantially impaired his

---

[11] While the parties agree that Plaintiff previously requested accommodations during his employment at Home Depot and Amazon, (Def. SUMF ¶ 7), there is no evidence in the record regarding this fact aside from Plaintiff's own deposition testimony. (Pl. Dep. at 84:18–84:02; *see supra* n.6.) Nor is there evidence that Plaintiff ever told Defendants he had received accommodations at his previous places of employment during his employment at Wayfair.

ability to perform his job. However, Plaintiff's own deposition testimony belies such a claim. When asked at his deposition whether he was unable to do his job without his dark-tinted glasses, Plaintiff testified as follows: "I'm going to say unable to? I would have headaches later on. So I still had to do my job." (Pl. Dep. at 86:12–14.) Thus, while Plaintiff has testified that he suffered from headaches after his work shifts, there is no evidence in the record that his condition substantially limited his ability to work. Further, Plaintiff offered no other evidence that his purported visual impairment affected other aspects of Plaintiff's life. Accordingly, Plaintiff has failed to satisfy the first prong of a disparate treatment claim under the ADA. *See Maslanka v. Johnson & Johnson, Inc.*, No. 04-5477, 2008 WL 918499, at \*10–\*17 (D.N.J. Mar. 31, 2008), *aff'd*, 305 F. App'x 848 (3d Cir. 2008) (finding that, even where a jury could find that plaintiff suffered a "physical or mental" impairment within the meaning of the ADA, plaintiff had not shown that he was substantially limited in a major life activity as required under the ADA and summary judgment was therefore appropriate).

Even assuming, *arguendo*, that Plaintiff was able to satisfy the first prong of his *prima facie* case, he is unable to show that he suffered an adverse employment consequence under the ADA. Plaintiff argues, in effect, that the adverse employment actions were (1) that he was not permitted to wear dark-tinted glasses in the warehouse and (2) that he was not trained on the Raymond Picker Forklift. An adverse employment action in the ADA disparate treatment context "is one which alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Decker v. Alliant Techs., LLC,* 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012). Assuming Plaintiff requested to wear dark-tinted glasses in the warehouse, Plaintiff has failed to demonstrate how the denial of this request deprived him of employment opportunities or adversely affected his

status as an employee while at Wayfair. Plaintiff has not established any nexus between this denial of his alleged verbal request to wear glasses and any employment consequence that could be viewed as "adverse." *Naber v. Dover Healthcare Assocs. Inc.*, 473 F. App'x 157, 161 (3d Cir. 2012) (in rejecting plaintiff's ADA discrimination claim, the court found that plaintiff "[m]ainly . . . fail[ed] to offer evidence supporting an inference of a causal connection between her disability and the adverse employment action.")

The Court reaches a similar conclusion with Plaintiff's claim that Defendants' purported refusal to train him in driving the Raymond Picker Forklift was an adverse employment action. Again, the record is without evidence on this claim, and Plaintiff failed to address or rebut Defendants' arguments regarding same; Plaintiff merely made a claim which he failed to develop through discovery or his briefing. "Absent evidentiary support, summary judgment is proper." *Hollinghead v. City of New York*, 592 F. App'x 110, 112 (3d Cir. 2015) (internal citation omitted). Summary judgment on Count III is appropriate.

Turning now to Plaintiff's claim under the NJLAD, Plaintiff advances a substantively identical claim as his ADA claim within Count VI. Thus, summary judgment here is also appropriate. As the Court explained with respect to the ADA claim, the Court interprets the NJLAD claim to be invoking a theory of disparate treatment under the NJLAD. To establish a *prima facie* case of disparate treatment under the NJLAD, Plaintiff must show the following:

> (1) he belongs to a protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment action.

*Sharkey v. Verizon New Jersey, Inc.*, No. 14-2788, 2014 WL 7336768, at *6 (D.N.J. Dec. 22, 2014). This claim is also analyzed under the *McDonnell Douglas* burden-shifting framework.

*Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 848 (3d Cir. 2016) (citing *Viscik v. Fowler Equip.*

*Co.*, 800 A.2d 826, 833 (N.J. 2002)).

Turning to the first prong of the *prima facie* case, the NJLAD protects individuals with

qualifying disabilities. *See* N.J. Stat. Ann. § 10:5-4.1 (West 2024). A disability under the NJLAD

is defined as follows:

> physical or sensory disability, infirmity, malformation, or
> disfigurement which is caused by bodily injury, birth defect, or
> illness including epilepsy and other seizure disorders, and which
> shall include, but not be limited to, any degree of paralysis,
> amputation, lack of physical coordination, blindness or visual
> impairment, deafness or hearing impairment, muteness or speech
> impairment, or physical reliance on a service or guide dog,
> wheelchair, or other remedial appliance or device, or any mental,
> psychological, or developmental disability, including autism
> spectrum disorders, resulting from anatomical, psychological,
> physiological, or neurological conditions which prevents the typical
> exercise of any bodily or mental functions or is demonstrable,
> medically or psychologically, by accepted clinical or laboratory
> diagnostic          techniques          .          .          .          .

N.J. Stat. Ann. § 10:5-5 (West 2024).

This definition is "significantly broader than" the analogous ADA provision. *Viscik*, 800

A.2d at 835. Even so, Plaintiff has failed to put forward any evidence in support of this claim.

*Affinity Healthcare Grp. Voorhees, LLC v. Twp. of Voorhees*, 624 F. Supp. 3d 494, 521 (D.N.J.

2022), *aff'd*, No. 22-2769, 2024 WL 195471 (3d Cir. Jan. 18, 2024) (in denying the NJLAD

disparate treatment claim, relying upon its ADA disparate treatment analysis on the same); *cf.*

*Algozzini v. DGMB Casino, LLC*, 2024 WL 3439445, at *5 (N.J. Super. Ct. App. Div. July 17,

2024) (per curiam) (reversing the trial court's granting of summary judgment on a NJLAD

discrimination claim in the retaliation context, noting that where plaintiff had submitted some

medical evidence of impairment that raised a genuine issue of material fact as to plaintiff's disability.) Accordingly, no genuine issue of material fact exists here, and the NJLAD claim fails.

Even assuming *arguendo* that Plaintiff is pleading a disparate treatment claim under the NJLAD based upon his protected status as an African American, his claim still fails. As previously discussed, neither the refusal of Plaintiff's alleged verbal request to wear "shades" in the Wayfair warehouse nor Defendants' alleged failure to train Plaintiff on the Raymond Picker Forklift has been shown to be an adverse employment action (1) because no evidence has been presented on these issues and (2) because Plaintiff has not shown that non-African American individuals were permitted to either wear dark-tinted glasses in the Wayfair warehouse or were trained on the Raymond Picker Forklift where Plaintiff was not. *Kimber-Anderson v. City of Newark*, 502 F. App'x 210, 212 (3d Cir. 2012) (in finding that plaintiff-appellants did not suffer an adverse action under the NJLAD with respect to their disparate treatment claim, the Third Circuit explained plaintiff-appellants were "unable to meet the prima facie case threshold because they [could not] demonstrate that they suffered an adverse employment action that others outside of their protected class did not suffer."). Summary judgment on Count VI is also appropriate.

For the reasons above, summary judgment is granted on Counts III and VI.

### B. COUNT V - TITLE VII AND NJLAD RACE DISCRIMINATION CLAIM

In Count V, Plaintiff claims that, because he is African American, he was subjected to adverse action in the form of his reassignment following his forklift collision. The Court also interprets this Count to invoke Plaintiff's termination as an adverse employment action resulting from racial discrimination against him.[12] (*See* FAC ¶ 159.) Plaintiff claims, in effect, that the

---

[12] In his FAC, Plaintiff appears to argue that African Americans were unequally subjected to Wayfair's color-coded vest policy on the warehouse floor. (*See* FAC ¶ 56; Def. Mot. at 21–24.) Specifically, Plaintiff argued that—while he and other African Americans were forced to wear vests of a certain color on the

invocation of the Near Miss Policy was mere pretext for racial discrimination. Defendants claim that this reassignment was not an adverse employment action and even if it were, there are non-pretextual reasons for the reassignment. Like Plaintiff's ADA and NJLAD disparate treatment claims, Plaintiff's Title VII and NJLAD race discrimination claims are analyzed under the burden-shifting framework established in *McDonnell Douglas*. *Tourtellotte*, 636 F. App'x at 841. Before undertaking an analysis into the burden-shifting framework of *McDonnell Douglas*, Plaintiff must establish a *prima facie* case of discrimination. *Id.* at 842. For the reasons below, summary judgment on Count V based on Plaintiff's temporary reassignment is granted. However, summary judgment on Count V based on Plaintiff's termination is denied.

To establish a *prima facie* case of discrimination under NJLAD and Title VII, Plaintiff must establish the following four elements: (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for the position he held; (3) Plaintiff suffered an adverse employment action; and (4) that the adverse employment action gives rise to an inference of unlawful discrimination. *Id.* at 842 (citations omitted). It is undisputed that Plaintiff satisfies element one as

---

warehouse floor while at Wayfair—other individuals were not subjected to the same treatment. (*See* FAC ¶ 56.) He specifically references a "Latino [sic] cleaning lady and was [sic] seen in the work area not wearing an appropriate vest a [sic] required" where he claims that another African American associate was "terminated by Manager Gerrod for getting caught waiting for his girlfriend to bring him his safety vest . . . ." (*Id.*) In the summary judgment record, Plaintiff has failed to put forth any evidence on these claims. Plaintiff's opposition makes no reference at all to Wayfair's color-coded vest policy. (*See* Pl. Opp.) Plaintiff also failed to respond to any of Defendants' arguments on the matter. For example, in Plaintiff's response to Defendants' Statement of Undisputed Material Facts surrounding Wayfair's color-coded vest policy, Plaintiff raised no genuine issues of material fact; instead, he leveled discovery objections discussed at *supra* Section I. (Pl. SUMF Resp. 49–53.) "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument[.]" *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (internal citations omitted). Here, Plaintiff has not made arguments beyond vague references in his unverified FAC. Thus, to the extent Plaintiff ever made such a claim, summary judgment on Count V as to alleged race discrimination regarding the enforcement of Wayfair's color-coded vest policy is granted as to all Defendants.

he identifies as African American. Additionally, there is no dispute that Plaintiff was qualified for the position he held. Defendants instead dispute whether Plaintiff can establish elements three or four. The Court analyzes both elements below.

Regarding element three of his *prima facie* case, Plaintiff claims his temporary reassignment following the forklift collision was an adverse employment action. An adverse employment action is understood to be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 152–53 (3d Cir.1999) (quoting *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In other words, it is a "material change [to] the terms or conditions" of Plaintiff's employment. *Burton v. Pennsylvania State Police*, 612 F. App'x 124, 127 (3d Cir. 2015).

Although there is a question of fact as to whether any property damage was incurred as a result of Plaintiff's October 17, 2019 forklift accident, (*see* Pl. SUMF Resp. ¶ 42), the Court agrees with Defendants that a temporary reassignment, under these circumstances, cannot constitute an adverse employment action for the purpose of Plaintiff's race discrimination claim where there was no change in Plaintiff's status as an employee. Even assuming *arguendo* that Plaintiff is correct and no property resulted from the October 17, 2019 accident, Plaintiff has put forth no evidence that his temporary reassignment was a significant alteration in his employment. Specifically, Plaintiff has failed to adduce evidence that this temporary reassignment resulted in a significant change in his employment given that it is undisputed that (1) his reassignment was temporary and (2) he was paid at the same rate and allotted the same hours as he had in his job as an order picker. Because there was no change to Plaintiff's job title, pay rate, or hours of work, the Court finds that Plaintiff did not suffer an adverse employment action. *See, e.g., Fiorentini v.*

24

*William Penn Sch. Dist.*, 665 F. App'x 229, 234 (3d Cir. 2016) (in the employment context, finding that plaintiff's internal job reassignment—where such a reassignment "did not change [plaintiff's] title salary, or benefits[]" or her job responsibilities—was not an adverse employment action since plaintiff's own subjective view of the reassignment had no bearing on the analysis); *James v. A.C. Moore Arts & Crafts, Inc.*, No. 18-063, 2021 WL 1226421, at *7 (D. Del. Mar. 31, 2021), *aff'd sub nom. James v. A.C. Moore Arts & Crafts Inc./Sbar's Inc.*, No. 21-1733, 2022 WL 327012 (3d Cir. Feb. 3, 2022) (in the employment context, noting that plaintiff's reassignment to less "desirable" cashier and janitorial duties was not an adverse employment action where said reassignment did not change plaintiff's title, salary, or benefits.)

Further, Plaintiff fails to meet element four of his *prima facie* case—that is, whether his reassignment gives rise to an inference of discrimination. The only evidence Plaintiff has presented on this element is uncontextualized deposition testimony from an individual named "Karon Claridy-Perry"—presumably another Wayfair employee. In her deposition testimony, Claridy-Perry states that she witnessed an incident where an associate by the name of "Chapo"[13]—who was not African American—was purportedly subjected to a different level of discipline following an incident on Wayfair machinery than African American individuals like Plaintiff. Claridy-Perry testified to one particular incident as follows:

> **Q**. All right. My question to you is, when you worked that shift with Donnie [Lovill], have you seen Donnie [Lovill] show non-African American associates preferential treatment?
> **A**. Preferential treatment? Can you word it another way?
> **Q**. Have you seen him allow non-[B]lack associates to do things—
> **A**. Yes
> **Q**. – and not be written up but when African American –
> **A**. A couple times, yeah, especially with this guy.

---

[13] While the deposition refers to this individual as "Chapo," the Court believes this to be a stenographical error and that these references are to "Choppo," the individual named in the FAC and Defendants' Motion. (*See* FAC ¶¶ 49–50; Def. Mot. at 21 n.6.)

. . .

**Q**. On that particular day—on that particular day is it your knowledge that this particular associate ran through a break room wall and left, and he was found only by video after he destroyed the property of the break room – in the break room – in the warehouse Building 44? Is that correct?

**A**. Correct.

**Q**. And when this particular—when this particular associate, Chapo, ran into the wall, was anything done that particular day? Was he disciplined after they watched the video?

**A**. After they watched the video? No, he wasn't disciplined at all, not that I recall.

**Q**. . . . How would you remember that nothing happened?

**A**. Because I actually hung out with Chapo after work a few times, and he told me about, the incident. And I didn't even see the incident, but I heard about it, because I was busy working. And he said, "Lucky me." He said, "Boy, I was high as s***." . . . .

(ECF No. 99-4 at 14–15 (excerpt of Karon Claridy-Perry Deposition from October 6, 2023 at 22:01–13; 23:01–24:07).)

First, this deposition testimony was appended to Plaintiff's opposition without context or explanation. The only clues in Plaintiff's opposition are three references to Claridy-Perry's deposition in which Plaintiff attempts to introduce into the record a diagram Plaintiff himself drew. (Pl. Opp. at 5–6.) Plaintiff attempts to advance arguments by underlining or highlighting lines of the deposition he seems to believe are relevant. (*See* ECF No. 99-4 at 14–15.) This deposition excerpt does not raise a genuine issue of material fact since the Court is wholly without context to what it refers, and this deposition excerpt should not be considered in the Court's analysis. *EDI Precast, LLC v. Carnahan*, 982 F. Supp. 2d 616, 622 n.6 (D. Md. 2013) (finding that plaintiff's inclusion of an uncontextualized exhibit to his motion for summary judgment "[could not] be considered as proof of any fact relevant to this case . . . ." and was subsequently disregarded in consideration of the motion). Thus, since the Court has been presented with no evidence that Plaintiff's reassignment could give rise to an inference of discrimination—even assuming that

Plaintiff's temporary reassignment to the Receiving Department was an adverse employment action—Plaintiff's *prima facie* case fails on element four because no inference of discrimination has been created.

Turning now to Plaintiff's other claimed adverse employment action—his termination. The Court finds that two genuine issues of material fact preclude summary judgment on this claim: (1) whether Plaintiff was using his phone in violation of Wayfair's Electronic Device Usage Policy and (2) whether an IT incident occurred which prevented Plaintiff from working. The Court has carefully examined the video footage, (*see* ECF Nos. 91-17, 91-18, 91-19), and notes that the vantage point of the warehouse floor within the videos renders it difficult to determine precisely what Plaintiff is doing. Plaintiff appears to be sitting and resting on a pile of wood within the warehouse. No phone is visible. Indeed, Defendants themselves only state that Plaintiff was speaking on his Bluetooth headset in the video. (*See* Def. SUMF Resp. ¶ 63.)

In addition, there is no timestamp and no date on the footage provided to the Court, thus complicating the Court's task in determining the actual time of this video footage. Lastly, assuming that this footage is from the date in question, a genuine issue of material fact exists with respect to whether Plaintiff was even able to work due to a purported IT incident at the time the footage was taken. Plaintiff has stated that such an event occurred and that this event precluded him from working. (*See* Pl. SUMF Resp. ¶¶ 63–64.) Indeed, records from that day indicate that there was a technology issue which prevented individuals from working entirely. (Incident Report at 2.) While Defendants claim that the incident was resolved well before Plaintiff's shift, Plaintiff contends that the incident was not resolved. "In evaluating employment cases, the task of the Court is not to second-guess employment decisions but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose." *Allia v. Target Corp.*, No. 07-4130, 2010

WL 1050043, at *6 (D.N.J. Mar. 17, 2010) (citing *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 525–27 (3d Cir. 1992)). Accordingly, genuine issues of material fact persist with respect to Count V, and summary judgment is denied as to same.[14]

### C.  COUNTS VII, VIII – TITLE VII AND NJLAD EMPLOYMENT RETALIATION CLAIMS

In Counts VII and VIII, Plaintiff argues that he was retaliated against in violation of Title VII and NJLAD on two grounds. Plaintiff argues, in effect, that because he filed an EEOC Charge complaining of racial discrimination, Plaintiff was (1) denied a $500 referral bonus (Count VII) and (2) temporarily reassigned following the October 17, 2019 forklift accident (Count VIII). In effect, Plaintiff argues that Defendants' proffered reasons for the denial of a referral bonus and his reassignment are pretextual. Because no genuine issue of material fact exist as to Counts VII and VIII, summary judgment is appropriate.

To make a *prima facie* case of retaliation under Title VII and NJLAD, Plaintiff must show that (1) he was engaged in a protected employee activity; (2) Wayfair took adverse employment action after or contemporaneous with Plaintiff's protected activity; and (3) a causal link exists between Plaintiff's protected activity and Wayfair's adverse action. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001). The burden-shifting framework of *McDonnell Douglas* again applies. *Sgro v. Bloomberg L.P.*, 331 F. App'x 932, 937 (3d Cir. 2009).

With respect to Plaintiff's *prima facie* case in Count VII, Defendants do not dispute that Plaintiff meets element one since it is undisputed that Plaintiff filed an EEOC Charge. (*See* ECF No. 103 ("Def. Reply") at 17.) Rather, Defendants argue that Plaintiff has not established the second or third elements of his retaliation claims. (Def. Mot. at  24–25; Def. Reply at 17.) The

---

[14] Given these disputes, the Court will not address whether individual liability surrounding Plaintiff's termination on Count V is appropriate under the NJLAD. (*See* Def. Mot. at 44.)

Court agrees. No adverse employment action was taken here because it is undisputed that Plaintiff

did not qualify for a referral bonus under Wayfair's own policies because Plaintiff was not a "full-

time" or "part-time" employee of Wayfair when he made his supposed referral. Wayfair's

Employee Referral Program brochure contains the following language: "Full-time and part-time

employees of Wayfair are eligible to participate in the program." (Ex. 2 to Weber's Decl. at 2.) It

further notes that candidates for the bonus include "former Wayfair employees, temporary agency

personnel, candidates responding to a college job posting ad placed by a current Wayfair employee,

and employee referral candidates that have already been submitted by employment agencies that

result in an agency fee hire." (*Id.*)

Plaintiff argues that he referred Robinson in a three-way phone call with Uniman and

Robinson on September 16, 2019. (ECF No. 99-3 at 31; *see also* Uniman Dep. at 87:01–87:25.)

Even assuming the truth of Plaintiff's allegation, this employment referral occurred a week before

Plaintiff began his employment with Wayfair on September 23, 2019. (*See* Def. SUMF ¶ 2.)

Therefore, within the plain meaning of Wayfair's written policy, Plaintiff was not entitled to earn

the bonus given that he was neither a full-time nor part-time employee. *See McIntyre-Handy v. W.*

*Telemarketing Corp.*, 97 F. Supp. 2d 718, 731 (E.D. Va. 2000), *aff'd*, 238 F.3d 413 (4th Cir. 2000)

(in evaluating *pro se* plaintiff's employment case at summary judgment, noting that the plain

language of defendant's employment handbook "clearly show[ed]" that plaintiff's behavior was

grounds for immediate dismissal under same). As such, no causal link exists between the refusal

of the employment referral bonus and the protected action of filing the EEOC Charge. Summary

judgment as to all Defendants on Count VII is granted.

With respect to Count VIII, Plaintiff is similarly unable to establish a *prima facie* case

because he fails at elements two and three. As noted above, an adverse employment action is "a

significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits."

*Durham Life Ins. Co.*, 166 F.3d at 152–53 (quoting *Burlington Industries, Inc.*, 524 U.S. at 761).

As previously stated, Plaintiff has failed to adduce evidence that this temporary reassignment

resulted in a significant change in his employment. Therefore, Plaintiff cannot show that this

reassignment was an adverse employment action. Even if Plaintiff could establish that his

reassignment was an adverse action, Plaintiff has still failed to establish element three—a causal

link—because the protected action of filing the EEOC Charge was not contemporaneous with his

reassignment. Rather, it is undisputed that Plaintiff's reassignment happened *the day before*

Plaintiff filed the EEOC Charge, (*see supra* at 7–8), undermining Plaintiff's argument that his

reassignment was somehow motivated by the filing of the EEOC Charge.

 Summary judgment in favor of all Defendants under Counts VII and VIII is granted.

## **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 91) is **GRANTED** as to Count III; Count VI; Count VII; and Count VIII. Summary judgment is **GRANTED in part** and **DENIED in part** as to Count V consistent with the above Opinion. An appropriate Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: September 6, 2024